(C. D. 1705)

THE A. W. FENTON CO., INC.
AMERICAN MANUFACTURING CO. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 25, 1955)

*William Whynman* and *Daniel G. Connolly* (*William Whynman* of counsel) for the plaintiffs.

*Warren E. Burger*, Assistant Attorney General (*Richard H. Welsh* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation of so-called pressing rollers for use in connection with drawing frames in the treatment of vegetable fibers prior to the conversion of the fibers into yarn by other machinery was classified by the collector of customs as parts of machines, not specially provided for, and duty was imposed thereon at the rate of 15 per centum ad valorem pursuant to the provisions of paragraph 372 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 372),

as modified by the General Agreement on Tariffs and Trade (82 Treas. Dec. 305, T. D. 51802).

Plaintiffs contend that said articles are parts of textile machinery for manufacturing or processing vegetable fibers and dutiable, accordingly, at 10 per centum ad valorem as provided in said paragraph 372, as modified.

The pertinent text of paragraph 372, as modified, reads as follows:

Textile machinery, finished or unfinished, not specially provided for (except looms and machinery for making synthetic textile filaments, bands, strips, or sheets):

For textile manufacturing or processing prior to the making of fabrics or woven, knit, crocheted, or felt articles not made from fabrics (except bleaching, printing, dyeing, or finishing machinery):

For manufacturing or processing vegetable fibers (except winding, beaming, warping and slashing machinery, and combinations thereof) _____ 10% ad val.

\*          \*      '    \*          \*          \*      .   \*          \*

Other_____ 15% ad val.

To which should be added the proviso—

₀ Parts, not specially provided for, wholly or in chief value of metal or porcelain, of articles provided for in any item 372 of this Part:

\*          \*          \*          \*      '   \*          \*          \*

Other_____ The same rate of duty as the articles of which they are parts

At the trial, three witnesses were called, all of whom testified on behalf of the plaintiffs. They were men of wide experience and well informed in the technology and terminology of the textile industry. An analysis of their testimony will be made *infra*.

The following exhibits were introduced in evidence by plaintiffs:

Illustrative exhibit 1, sisal bag.

Exhibit 2, jute gunny bagging.

Exhibit 3, sisal rug yarn.

Illustrative exhibit 4, raw sisal.

Illustrative exhibit 5, sliver from the first drawing frame.

Illustrative exhibit 6, sisal sliver from the second drawing frame.

Illustrative exhibit 7, sisal sliver from the third drawing frame.

Illustrative exhibit 8, sliver yarn made from a sliver of the third drawing frame.

Exhibit 9, catalog.

Exhibit 10, fabric chart.

Collective exhibit 11, three price lists.

Exhibit 12, mat of jute yarn.

It appears from the record that the American Manufacturing Co. (the actual importer herein) is a manufacturer of twine, ropes of all

sizes, bagging, carpet yarn, mats, rugs, upholstery fabrics, and backs for carpets and rugs, and that the items in controversy consist of pressing rollers, so-called, in two sizes, which were designed for use as parts of the first, second, and third drawing frames in the processing of vegetable fiber.

John D. McGuire, who had been in the employ of the actual importer for more than 50 years, and with a broad knowledge of the installation and maintenance of the machines used in the various plants of the importer, described the process of treating raw fiber to produce a yarn. From his testimony, it is shown that raw fiber is brought to what is known as the first breaker which combs the fiber; a second and sometimes a third breaker are used for still finer combing. The fiber is then brought to a spreader, so-called, from which it goes to the first, second, and third drawing frames. The pressing rollers with which we are here concerned hold the fiber flat while the rollers draw the fiber from the hacklers. By putting the fiber through the first, second, and third drawing frames, a finer fiber is obtained. After the fiber leaves the third drawing frame, from which the fiber emerges as a sliver, it goes to the gill spinner, or jenny, which twists the fiber into yarn for use in the manufacture of backing for rugs, as well as rugs, mats, bagging, upholstery fabrics, and cordage.

The other two witnesses called on behalf of plaintiffs concurred in the statements of witness McGuire and also gave further testimony.

Christopher J. Fardy, the second witness, who had spent 38 years in the employ of the actual importing company and who was well qualified, testified that his company made sisal fabrics, rugs, and doilies, and chair fabrics used in the manufacture of summer furniture and that jute and sisal yarns were used in the making of burlap and sisal covering; that, between 1934 and 1940, his company made many millions of pounds of yarn used in the manufacture of rugs and fabrics.

John Joseph Gilligan testified that he had been employed by the American Manufacturing Co. for more than 22 years, being presently assigned to the sales department, and is thoroughly familiar with the means employed to produce jute yarn and its use.

It is clear from the record that the imported pressing rollers are used in conjunction with what are known as drawing frames for the purpose of manufacturing or processing vegetable fibers which fibers by further treatment, by machinery with which we are not here concerned, are converted into yarns.

If, therefore, the machinery of which the imported rollers are parts is designed and intended "For textile manufacturing or processing prior to the making of fabrics or woven * * * articles not made from fabrics * * *," to quote the text of paragraph 372, as modified, *supra*, it would seem that the subject merchandise is textile machinery within the meaning of the language above quoted.

Regarding the uses of the yarns which are made with textile machinery of which the imported rollers are parts, McGuire testified that the importer manufactures twine, ropes of all sizes, bagging, and backs for carpets and rugs and, at one time, manufactured fabrics out of jute and sisal twine; that in the company's Philadelphia plant they make carpet yarn averaging 30,000 pounds a day and that the New York plant produces about 16,000 pounds of jute carpet yarn a day. However, he stated that sisal yarn for rugs averages about 15 per centum of their production, the balance being used in making twine and rope. He stated that exhibit 3 is a sisal yarn, which is produced by the process described by him in converting vegetable fibers into yarn, and was the type of yarn which was woven into rugs on looms at the Brooklyn plant; that the manufacture of merchandise like exhibit 3 was discontinued in 1937 or 1938.

On cross-examination, McGuire stated that at all the plants with which he was familiar sisal was used for making yarns for rugs or tieing twines and rope; that about 80 per centum of it was used for cordage; that at the Greenpoint plant they manufacture about 30,000 pounds of jute a day, of which 16,000 pounds is carpet yarn and that this has been true since 1917; that production at the Philadelphia plant consists entirely of carpet yarn, about 30,000 pounds a day at full capacity.

It seems not to be disputed that the yarn made by McGuire's firm can be used either for making cordage or for weaving and that whether chiefly used for one purpose or the other would seem to depend largely upon economic conditions.

Fardy testified that in their Charleston and Greenpoint plants they manufactured sisal fabrics, rugs, doilies, and chair fabrics used in the production of summer furniture; that jute and sisal yarns are used in making burlap and sisal coverings. Through this witness a catalog (exhibit 9) was introduced, which illustrates the various fabrics made by his company; that, between 1934 and 1940, his company made many millions of pounds of yarn used in the manufacture of rugs and fabrics on these drawing frames; that they were made out of manila, sisal, jute, and paper. His testimony confirms that of McGuire that the yarns out of which the rugs manufactured by his concern were woven could be used both in the manufacture of rugs or cordage; that the fabric chart (exhibit 10) contained illustrations of various chair fabrics made by his company between 1934 and 1940; and that the manila and sisal yarns which went into the production of these fabrics were processed by rollers of the type involved herein.

Fardy further testified that exhibits 1, 2, and 3 (a sisal bag, jute gunny bagging, and sisal rug yarn, respectively) were manufactured at the company's Greenpoint plant between 1934 and 1940; that exhibits 1 and 2, the burlap and sisal covering, were manufactured in the "Charleston Bag and Mill and Eastern St. Louis" for the last

50 years; and that the sisal and jute yarns, which enter into the fabrication of exhibits 1 and 2, were produced in the same manner as the sisal and jute described in his earlier testimony.

Gilligan testified that he sold carpet yarn to a number of mills where he observed its use in weaving and in making carpet backing and carpets; that the Philadelphia plant manufactures about 9 million pounds a year of jute yarn used for carpeting, bagging, and carpets; and that in a "lean year" the average production would be about 4½ million pounds.

The testimony of the three witnesses called by plaintiffs stands uncontradicted. They were all men of long experience in the textile field, and it is evident from their testimony that the subject rollers are used in conjunction with drawing frames which are employed in the processing of vegetable fibers to produce a yarn and that such yarn is used in vast quantities in the production of woven fabrics such as rugs, bags, backing, upholstery fabrics, and carpet backing as well as in the manufacture of cordage, which latter has been at times extensively used in weaving.

Plaintiffs rely upon the decision of our appellate court in *Whitlock Cordage Co.* v. *United States,* 13 Ct. Cust. Appls. 656, T. D. 41490. The merchandise before the court in that case consisted of a "breaker card," a "third and finishing drawing frame," a "regulating gill spinning frame," a "24 spindle patented twister," and parts therefor.

In the course of its opinion in that case, the court observed—

It will be noted that the provision for "all other textile machinery or parts thereof, finished or unfinished, not specially provided for," in paragraph 372, *supra,* immediately follows the provision for "knitting, braiding, lace braiding, and insulating machines, and all other *similar textile machinery* or parts thereof." (Italics ours.)

Obviously, the provision was not intended to be limited in its operation to textile machinery of any particular kind, or to that which produced woven fabrics. It was intended, we think, to be sufficiently comprehensive to cover *all* textile machinery not otherwise specially provided for, and certainly includes machines which are used in the manufacture of textile materials.

The "breaker card," the "third and finishing drawing frame," and the "regulating gill spinning frame" are used in the manufacture of yarn, which is a textile material, and, therefore, they, and the parts therefor, are included within the provision for all other textile machinery. The "24-spindle patented twister" is used in twisting the yarn into strands, and the strands into rope. Its function is to manufacture a textile material into a product which is not a textile, either within the strict definition of that term, or within the broader construction here placed upon the statute. Nor does it process or otherwise make textile materials available for textile uses. We are of opinion that such machinery is not textile machinery, and that it was not intended to be included within the provisions therefor.

The judgment is modified, being reversed in so far as it holds the "24-spindle patented twister" and the parts therefor dutiable as textile machinery, and is otherwise affirmed. [Italics quoted.]

The court rendered its decision in the *Whitlock* case in 1926, and it has been regarded as the leading authority upon the meaning which Congress intended by the term "textile machinery."

It was there held by the court that the breaker card, drawing frame, and gill spinning frame, which were used in the manufacture of yarn (held to be a textile material), were textile machinery but that the machinery used for converting the yarn into rope was not textile machinery. The court recognized, however, that said yarn was adapted for weaving purposes.

Defendant in its brief refers to the fact that the lower court in the *Whitlock* case (47 Treas. Dec. 401, T. D. 40796) held that chief use must apply in order to bring merchandise within the provision for textile machinery and invites our attention to the following quotation from the case of *E. I. du Pont de Nemours & Co.* v. *United States*, 27 C. C. P. A. (Customs) 146, C. A. D. 75, as supporting that doctrine:

> As hereinbefore stated, we have repeatedly held that the term "all other textile machinery" includes machines which "are used in the manufacture of a textile material." It seems to us that the clear meaning of this language is that any machine which is chiefly used for performing a step in the process of manufacturing textile materials is textile machinery.

The record before us establishes beyond question that the subject rollers are used chiefly "for performing a step in the process of manufacturing textile materials." In other words, the rollers are parts of drawing frames which together with other machinery produce yarns— a textile material—and, as above pointed out, such yarns are used on a very large scale in producing woven fabrics as well as cordage. Consequently, we find nothing in the *du Pont* case which is inimical to our conclusion in the instant case.

In the case at bar, the parts which are used in conjunction with the drawing frames to produce yarn from vegetable fibers are parts of a textile machine which manufactures yarn used extensively not only in the fabrication of woven articles but as well in the production of cordage.

It is our considered opinion, therefore, based upon the present record, that the pressing rollers which form the subject of this controversy are parts of textile machinery within the meaning of the provisions of paragraph 372, as modified, *supra*, and are properly dutiable at 10 per centum ad valorem.

We have examined the various authorities other than the *Whitlock* case, *supra*, cited by counsel, but find nothing therein to alter the conclusions above reached.

For the foregoing reasons, we sustain the claim of plaintiffs that the subject merchandise should be classified in paragraph 372, as modified, *supra*, as parts of textile machinery for manufacturing or processing

vegetable fibers for use in the production of textiles prior to the making of fabrics or woven articles not made from fabrics and subjected to duty at the rate of 10 per centum ad valorem. All other claims are overruled.

Judgment will be entered accordingly.